UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

HOPE LUMBER & SUPPLY CO.,

        Plaintiff,

v.                              CASE No. 8:05-CV-1558-T-30TGW

SAN ANTONIO LUMBER CO.,
INC., et al.,

        Defendants.

_____

## REPORT AND RECOMMENDATION

Defendants San Antonio Lumber Company and Thomas A. Schrader filed a motion for a temporary restraining order to enjoin plaintiff Hope Lumber & Supply Company from interfering with the sale of their lumber inventory and other tangible assets to a lumber dealer and to preclude it from prosecuting any court action to prevent such a sale (Doc. 25). The motion, which was referred to me for a report and recommendation, is being considered as a request for preliminary injunction (Doc. 28). Based upon the parties' submissions and the oral argument of counsel, I recommend that a preliminary injunction be denied, primarily because the defendants have failed to show that they would be irreparably injured in the absence of that relief.

I.

Plaintiff Hope Lumber & Supply Company owns and operates lumber and building material yards in the southern United States, selling mainly to building contractors and professionals.  Defendant San Antonio Lumber Co., Inc., is a lumber and building supply business and Thomas A. Schrader is its principal shareholder.

On approximately June 11, 2001, the defendants and Patty Schrader entered into an Asset Purchase Agreement with third party Leeds Building Products, in which Leeds acquired certain of San Antonio Lumber's assets and business, including the name and trademark, "San Antonio Lumber Company" and "all goodwill relating to the Assets" (Doc. 24-1, ¶3; Doc. 24-2).[1]  Additionally, the parties executed two real estate agreements whereby Leeds agreed to lease the defendants' properties in San Antonio and Dade City, Florida (see Doc. 14-5, p. 2, ¶B).  Leeds operated lumberyards from those locations.

The Asset Purchase Agreement contained a Non-Competition and Non-Solicitation covenant ("the restrictive covenant") which prohibited the defendants from competing with Leeds or assisting others to compete with

---

[1]"Leeds" jointly refers to Leeds Building Products and SALCI Acquisition Company, which is a wholly owned subsidiary of Leeds.

Leeds for five years (Doc. 24-2, p. 10, Section 4.2).  The restrictive covenant

states, in pertinent part:

>        (A) <u>Prohibited Conduct</u>.  Except as otherwise
> expressly provided in this Agreement, during the
> Restricted Period, no member of the Selling Group
> shall, directly or indirectly, anywhere within the
> States of Georgia, Alabama, Florida, North
> Carolina, South Carolina or Tennessee, (i) engage
> in any aspect of the Restricted Business or assist,
> advise, represent or consult for any other Person in
> connection with such Person engaging in any
> aspect of the Restricted Business ... (iii) solicit, or
> attempt to solicit, any Persons who or which are
> clients or customers of Buyer or Leeds as of the
> Determination Date in connection with the
> engagement by any Person in the Restricted
> Business, (iv) otherwise disrupt or interfere with, or
> attempt to disrupt or interfere with, Buyer's or
> Leeds' relations with any actual or potential client,
> customer, distributor, supplier or any other material
> relationship of Buyer or Leeds.

>        (B)  <u>Certain Understandings</u>.  For purposes
> of this Section 4.2:
>
>                        ....
>
>        (ii) the term "Restricted Business" shall refer
> to the business of: (A) manufacturing, distributing,
> or selling lumber, doors, windows, trusses, siding,
> insulation, roofing, masonry or other building
> products, materials, supplies or equipment ... (C)
> selling or providing any other product or service
> that the Company sells or provides as of the
> Closing Date; and (D) selling or providing any
> other product or service that Buyer or Leeds sells
> or provides as of the Determination Date, provided,

however, that the "Restricted Business" shall not include... (ii) the sale of products to lumber dealers on a wholesale basis.

(iii) for each member of the Selling Group, the term "indirectly" shall include a reference to any business or entity: (1) which such member of the Selling Group engages in, consults for, manages, operates, controls or supervises or in which he or it participates in the management, operation, control or supervision of; or (2) in which such member of the Selling Group has any direct or material indirect ownership or material financial interest, other than the direct or indirect beneficial ownership by members of the Selling Group in the aggregate of less than two percent (2%) of the voting capital stock of a publicly held corporation;

....

On October 13, 2003, the defendants entered into an additional agreement with Leeds to repurchase a portion of the assets at the San Antonio location and terminate Leeds' lease for the San Antonio property (Doc. 24-3 ("the General Agreement"); Doc. 24-1, ¶4).[2]  The General Agreement also provided for the purchase of "goodwill related to the assets" and reversion to the defendants of the trademark "San Antonio Lumber Company" (id. at p. 3,

_____

[2]During the negotiations for the General Agreement, it was expressed that its purpose was to permit the defendants to operate a retail cash-and-carry hardware and farm supply business, but that the defendants would not sell to contractors engaged in the commercial construction of residential structures (Doc. 14-2, ¶¶ 3, 4; Doc. 14-6; Doc. 14-7).

Sections 1.1.3, 1.3.3; p. 6, Section 4.3).[3]  However, it stated that the parties "desire the Asset Purchase Agreement first put in place...to remain in full force and effect, in its entirety, unless specifically altered and agreed to in th[e] ... General Agreement" (Doc. 24-3, p. 2, ¶D).

On February 28, 2005, Leeds sold its assets, including all its rights under the Asset Purchase Agreement, to plaintiff Hope Lumber (Doc. 14-2, ¶7; Doc. 14-9).

During the summer of 2005, the plaintiff concluded that the defendants were violating the restrictive covenant by selling lumber to contractors engaged in commercial construction and, consequently, filed this lawsuit against the defendants for breach of contract (Doc. 1; Doc. 14-2, ¶8). The plaintiff subsequently filed a motion for expedited discovery and a temporary restraining order based upon the additional allegation that the defendants were planning to sell their business to another lumber dealer (Docs. 7, 16).  Thus, the plaintiff sought to enjoin temporarily the defendants

---

[3]It is presently unclear whether the General Agreement effected a reversion of the goodwill in its entirety or just a portion of it.  Thus, the defendants argue that they reacquired all of the goodwill (Doc. 25, p. 5). The plaintiff, however, has made the substantial argument that only one-tenth of the goodwill was repurchased by the defendants, as evidenced by the purchase price of $75,000 for the goodwill (Doc. 24-3, p. 3, Section 1.3.3), which was one-tenth the price paid to the defendants for goodwill in the Asset Purchase Agreement two years earlier (Doc. 14-2, ¶2).

from selling their business, alleging that such a sale would violate the restrictive covenant's provision against assisting another person to compete against the plaintiff (Doc. 16, p. 2).  The motion was referred to me for a report and recommendation (Doc. 18).  A hearing was held on the matter, and the plaintiff's motion was denied without prejudice because the factual record was not sufficiently developed (Docs. 19, 20).  Accordingly, the parties were permitted to take two depositions each regarding the alleged violations of the restrictive covenant and the sale of the defendants' business (Doc. 20).

Thereafter, the defendants filed a counterclaim, seeking a declaratory judgment that the planned sale of their inventory and other tangible business assets does not violate the restrictive covenant (see Doc. 21, p. 5).  They then filed this motion for a temporary restraining order, alleging that the plaintiff is impeding the planned  sale by scheduling the deposition of the prospective purchaser and by pursuing this litigation (Doc. 25).  In the motion, the defendants seek to enjoin the plaintiff from interfering with its "negotiations to sell San Antonio Lumber's inventory and other tangible business assets ... to an unrelated third party lumber dealer" and from prosecuting any court action attempting to restrict or prevent such a sale (Doc. 25, pp. 1, 5).

The motion was referred to me for a report and recommendation (Doc. 26). The referral, which requires a ten-day objection period, is an implicit denial of the request for a temporary restraining order (Doc. 28). Consequently, the motion is being considered as a request for preliminary injunction (id.). The plaintiff has filed an opposition to the motion for preliminary injunctive relief, arguing that an injunction is improper because the defendants' proposed sale of their assets violates the restrictive covenant and, in any event, the defendants have not shown irreparable harm since any possible damage can be remedied with a monetary award (Doc. 31).

A hearing was subsequently held on the motion (Doc. 32). The defendants specified at the hearing that they were in negotiations with Cox Lumber Company to sell their assets. As a result of the sale, Cox would operate a lumberyard at San Antonio Lumber's current location in San Antonio. Thus, the sale would convey substantially all of the defendants' inventory and capital equipment located at the San Antonio lumberyard, and Cox would also lease the San Antonio property. Schrader asserts that the sale would not convey "any of the defendants' intangible property, including defendants' good will, trade name or client lists" and that he "will not ... obtain any ownership interest in" or accept "a management, ... advising or ...

consulting role for[] the third party lumber dealer with whom [he] ha[s] been negotiating" (Doc. 24-1, ¶6).  The sale is currently on hold because Cox is purportedly hesitant to complete the purchase due to the pending litigation.

II.

A preliminary injunction may be issued when necessary "to protect the [movant] from irreparable injury and to preserve the district court's power to render a meaningful decision after a trial on the merits."  <u>Canal Authority of State of Florida</u> v. <u>Callaway</u>, 489 F.2d 567, 572 (5th Cir. 1974).  The remedy, however, is considered "extraordinary and drastic."  <u>Siegel</u> v. <u>Lepore</u>, 234 F.3d 1163, 1176 (11th Cir. 2000).  It may be granted only if the movant demonstrates (1) a substantial likelihood that it will prevail on the merits; (2) a substantial threat that it will suffer irreparable injury if the injunction is not granted; (3) that its threatened injury outweighs the threatened harm the injunction may cause the opposing parties; and (4) that granting the injunction will not disserve the public interest.  <u>Haitian Refugee Center, Inc.</u> v. <u>Baker</u>, 949 F.2d 1109, 1110 (11th Cir. 1991).  The motion should ordinarily be denied if the movant fails to meet its burden as to even one of the foregoing prerequisites.  <u>United States</u> v. <u>Jefferson County</u>, 720 F.2d 1511, 1519 n.21 (11th Cir. 1983).

III.

Ordinarily, an evaluation of whether a preliminary injunction is warranted begins with an analysis of the likelihood of success on the merits. However, in this case it is clear that the defendants have not shown irreparable harm, and, therefore,  it is appropriate to begin with that element.  See Siegel v. Lepore, supra, 234 F.3d at 1175-76.

A.  Irreparable injury.

The defendants argue that they will suffer irreparable harm  as a result of the plaintiff's purported interference with the sale (Doc. 25, pp. 13-15).  The plaintiff, on the other hand, contends that there is no basis for a finding of irreparable harm because the defendants' injury is speculative and, in any event, could be remedied with a monetary award (Doc. 31, pp. 16-17).

The Eleventh Circuit has said that "[a] showing of irreparable harm is 'the sine qua non of injunctive relief.'"  Northeastern Florida Chapter v. City of Jacksonville, Florida, 896 F.2d 1283, 1285 (11th Cir. 1990).  The court explained this element as follows (id.) (citations omitted) (emphasis in original):

> The injury must be 'neither remote nor speculative,
> but actual and imminent.' An injury is 'irreparable'
> only if it cannot be undone through monetary
> remedies.  The key word in this consideration is

<u>irreparable</u>.  Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.

The defendants in this case have not met their burden of showing that irreparable harm will result if preliminary injunctive relief is not entered. On this element, the defendants assert that the plaintiff's purported interference is "discouraging any potential buyer from purchasing defendants' inventory or business assets, thereby reducing the value or potential value of such defendants' business and assets" (Doc. 21, p. 11; <u>see also</u> Doc. 25, p. 14).  However, that is economic harm that can be remedied with a monetary award.

At this point, the potential sale of the defendants' assets involves a single purchaser.  Consequently, if the plaintiff's actions cause the sale to fall through, the amount of damages could be readily determined by reference to the proposed sale price.  Notably, the defendants have failed to provide a cogent reason in their memorandum, or during the hearing, why such a monetary award would be an inadequate remedy.  <u>See</u> <u>Northeastern Florida Chapter</u> v. <u>City of Jacksonville, Florida</u>, <u>supra</u>, 896 F.2d at 1286.

In support of a claim of irreparable harm, defense counsel at the hearing cited to <u>Dotolo</u> v. <u>Schouten</u>, 426 So.2d 1013 (Fla. App. 1983) and <u>Chase Manhattan Bank USA, N.A.</u>, v. <u>National Arbitration Council, Inc.</u>, No. 3:04-CV-1205-J-32HTS, 2005 WL 1270504 (M.D. Fla. May 27, 2005), for the proposition that irreparable harm is presumed in cases involving tortious interference with business relations. Although, construing the counterclaim liberally, the defendants seem to allege such a claim (<u>see</u> Doc. 21, p. 11), the defendants have not shown that they are likely to succeed on that claim.

Importantly, in order to be entitled to a presumption of irreparable harm arising from a claim of tortious interference with business relations, the defendants would have to show not only a likelihood of success on the merits of their contention that the sale would not violate the restrictive covenant, but also a likelihood of success on a claim of tortious interference. The defendants clearly have not made the latter showing. Indeed, the defendants have not even discussed the elements of that tort in their motion (Doc. 25, p. 7), much less come forward with some evidence to support it.

The plaintiff, on the other hand, has submitted an affidavit from a vice president stating that "no representative of Hope Lumber has contacted any third party lumber dealers regarding the sale of Defendants' business or

assets except that counsel for Hope Lumber has contacted Cox Lumber Company to schedule a deposition of a corporate representative of that company" (Doc. 31-2).  As indicated, there is no evidence contradicting this showing.

The defendants have not made any attempt to establish that the scheduling of a deposition in this case would amount to the tort of intentional interference with business relations.  Moreover, there is authority to the contrary.  <u>Williams</u> v. <u>Carney</u>, No. 05-10769, 2005 WL 2662550 at *4 (11th Cir. Oct. 19, 2005)(unpub. op.)(deposition covered by Florida's litigation privilege).  Furthermore, there is nothing improper about contacting a deponent to schedule a deposition since "[a] lawyer shall reasonably attempt to accommodate the schedules of opposing lawyers, parties and witnesses in scheduling discovery."  Middle District Discovery (2001), 1.A.2; <u>see</u> <u>also</u> <u>id</u>. at p. 5.  In addition, if there were some impropriety with the scheduling of a deposition of Cox Lumber, then the appropriate remedy would be by a protective order under Rule 26(c), F.R.Civ.P., and not by a powerful and drastic preliminary injunction.

In short, the only argument the defendants have advanced in support of a claim of irreparable harm is based upon a presumption of such

harm in instances of intentional interference with business relations. However, the defendants have failed to make any meaningful showing of such a tort. Consequently, there is no presumption of irreparable harm in this case.

In all events, even if there were such a presumption, it would be rebutted under the circumstances presented here. As previously explained, any harm the defendants suffer from unjustifiable interference with the sale of their assets could be adequately remedied by money damages. The defendants therefore have failed to make a showing of irreparable harm. That failure defeats the request for preliminary injunctive relief.

B. <u>Likelihood of success on the merits</u>.

In view of the defendants' inability to demonstrate irreparable harm, it is unnecessary to address the other requirements for a preliminary injunction. Nevertheless, it is appropriate to point out briefly that any showing (by either side) of likelihood of success on the merits is made problematic by the lack of a developed factual record.

The defendants assert that the sale to Cox Lumber does not violate the restrictive covenant because Schrader "will not ... obtain any ownership interest in" or accept "a management, ... advising or ... consulting role for[] the third party lumber dealer with whom [he] ha[s] been

negotiating" (Doc. 24-1, ¶6).  However, it is impossible to determine whether the planned sale would violate the restrictive covenant since all of the terms of the sale have not been determined.   Thus, the defendants state in their memorandum that they "are currently engaged in negotiations" with the potential buyer (Doc. 25, p. 5).  Until the terms of the agreement are fully established and the sale is completed, any conclusion whether the sale would violate the restrictive covenant would be premature.

The defendants also argue that the restrictive covenant is unenforceable because there is no legitimate business interest justifying the restrictive covenant, which is necessary under Florida law for its enforcement (id. at pp. 9-12).  In this connection, the defendants argue that the goodwill, which is the legitimate business interest relied upon by the plaintiff, is not owned by the plaintiff because it was repurchased by the defendants in the General Agreement.

However, the plaintiff argues that only a portion of the goodwill was repurchased.  In this regard, the plaintiff presented evidence that the $75,000 paid by the defendants for the goodwill was only one-tenth of the $750,000 that Leeds had originally paid to the defendants for all of the goodwill (Doc. 14-2, ¶¶ 2, 5).  Thus, the plaintiff argues that the defendants'

payment of a small fraction of the original price demonstrates that only a portion of the goodwill was repurchased.[4]   The plaintiff's contention that the restrictive covenant remains effective is buttressed by evidence that, after the execution of the General Agreement (and, concomitantly, the repurchase of the goodwill), Schrader acknowledged the continued validity of the restrictive covenant (id. at ¶6).   Consequently, the conflicting evidence on the issue of goodwill does not permit at this stage of the proceedings a finding that the defendants are substantially likely to prevail on their contention that the noncompetition agreement is no longer enforceable due to a lack of a protectable interest.

IV.

In sum, the defendants have failed to show irreparable harm since their injuries could be compensated by a monetary award.   In addition, the merits of the case are not sufficiently clear, as to either side, to warrant the

---

[4]The plaintiff contends that this is consistent with the parties' purported understanding that the defendants' repurchase of assets was only to permit the defendants to operate a cash-and-carry hardware and farm supply business (Doc. 14-2, ¶5; Doc. 14-7; Doc. 14-6).   Although the defendants argue that evidence of any such understanding is inadmissible because the General Agreement specifies that it supersedes all prior understandings (Doc. 24-3, p. 6, Section 4.4), such parole evidence may become necessary in order to define the ambiguous contract language regarding the goodwill.

drastic relief of a preliminary injunction.  Therefore, I recommend that the

motion for a temporary injunction (Doc. 25) be denied.

Respectfully submitted,

THOMAS G. WILSON
UNITED STATES MAGISTRATE JUDGE

DATED: DEC. 9, 2005

NOTICE TO PARTIES

Failure to file written objections to the proposed findings and

recommendations contained in this report within ten days from the date of its

service shall bar an aggrieved party from attacking the factual findings on

appeal.  28 U.S.C. 636(b)(1).